USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/19/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

A.D. and M.D., *individually, and on behalf of* E.D., *a minor*,

                                      Plaintiffs,

                                      -v-

NEW YORK CITY DEPARTMENT OF EDUCATION,

                                      Defendant.

------------------------------------------------------------X

No. 12 Civ. 2673 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

       Plaintiffs A.D. and M.D. (the "Parents"), individually and on behalf of their minor child E.D. (the "Student"), bring this action against Defendant New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.[1] The Parents assert that the DOE failed to provide their daughter, who has been diagnosed with autism, a free appropriate public education for the 2010-2011 school year and seek reimbursement for her private school tuition for that year. The Parents seek review of a December 7, 2011 administrative decision of a State Review Officer ("SRO") affirming an Impartial Hearing Officer's ("IHO") denial of the Parents' request for reimbursement. The parties agreed that, since this case is essentially an appeal of the SRO's decision, the matter would be resolved on motion practice. (Dkt. No. 7.)[2] For the following reasons, the Parents'

---

[1]     Congress amended the IDEA by enacting the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), Pub. L. No. 108-446, 118 Stat. 2647, which took effect on July 1, 2005. Courts, however, continue to refer to the amended act as the IDEA. Except where noted, the statutory citations in this Opinion are to the IDEA as amended by the IDEIA.

[2]     The Parents motion for summary judgment was accompanied by a Rule 56.1 Statement. The DOE's opposition did not include a responsive Rule 56.1 statement because the DOE believed "that the instant matter was

motion for summary judgment is denied and judgment is entered for the DOE.

I.  **Statutory Framework**

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education" ("FAPE") and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A), (B); see also Forest Grove Sch. Dist. v. T.S., 557 U.S. 230, 239-40 (2009) (discussing the purposes of the IDEA). Under the statute, states receiving federal funds are required to provide a FAPE to all children with disabilities residing in the state. Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (citing 20 U.S.C. § 1412(a)(1)(A)).

To ensure the provision of a FAPE, a school district must create an individualized education program ("IEP") for each qualifying child. 20 U.S.C. § 1414(d); Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system). An IEP is a written statement, developed annually, that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012).

In New York, responsibility for developing a student's IEP rests with a Committee on Special Education ("CSE") appointed by the school board or the school district's trustees. See Gagliardo, 489 F.3d at 107. Each CSE is comprised of, among others, the student's parent or

---

to be briefed as an appeal" and that a Rule 56.1 statement was "not necessary." (Def.'s Opp'n 5 n.2.) The Court agrees that Rule 56.1 Statements are not required in IDEA cases and therefore has not requested that the DOE file one. See T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) ("A Rule 56.1 statement, while not required, may assist the court's inquiry into whether IDEA procedures were followed and whether the result was reasonably designed to confer educational benefits. But while a Rule 56.1 statement may assist the court in reviewing particular issues, it is not in and of itself dispositive.").

guardian, a representative of the school district, the student's special education teacher and a school psychologist. 8 N.Y.C.R.R. § 200.3(a)(1). The CSE must develop an IEP that is "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 207 (1982). Nonetheless, the IEP need not provide "every special service necessary to maximize each handicapped child's potential." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (quoting Rowley, 458 U.S. at 199). In evaluating an IEP, courts must also be mindful of the IDEA's requirement that disabled children be placed in the "[l]east restrictive environment." 20 U.S.C. § 1412(a)(5).

Parents may challenge the adequacy of their child's IEP through an impartial due process hearing before an IHO appointed by the local board of education. Grim, 346 F.3d at 379. At that hearing, "the school district has the burden of demonstrating the appropriateness of its proposed IEP." Id. Following the IHO's decision, the aggrieved party may appeal to an SRO, whose decision may then be challenged in state or federal court. Gagliardo, 489 F.3d at 108.

## II. Factual Background

The Student was fourteen years old at the start of the 2010-2011 school year. (Def.'s Ex. 6 at 1.) She is classified as a student with autism, (id.), and is thus a "child with a disability" under the IDEA. 20 U.S.C. § 1401(3)(A)(i). The Student exhibits deficits in, among other areas, her communication, social interactions, sensory processing, motor planning and sequencing. (IHO Hearing Transcript ("Tr.") 353-54; Pls.' Ex. L at 1.) She is able to speak in English and Spanish but is verbally limited and uses short phrases to communicate. (Tr. 353; Pls.' Ex. K at 2.) She is cognitively and academically delayed and presents with significant sensory needs. (Tr. 353-56; Def.'s Ex. 6 at 3.) She is oversensitive to auditory and tactile stimuli and under-

responsive to proprioceptive and vestibular stimuli, which can cause her demeanor to change rapidly. (Tr. 353-54.) Her inability to process information quickly can make her anxious, especially when the Student is transitioning between activities or locations. (Tr. 356-58; 387-96; IHO Decision 21-22.)

The Student attended Public School 48 until she completed fifth grade in 2006. (Tr. 347, 714.) For the 2006-2007 school year, the Parents placed the Student at the Rebecca School. (Pls.' Mem. 2.) The Rebecca School is a private school for children with autism and other neurodevelopmental delays that utilizes the Developmental Individual-difference Relationship-based ("DIR") Model. (Id.) The Parents then commenced a due process proceeding seeking reimbursement for the Student's tuition for that year. (Pls.' Exs. T at 6-7.) The parties entered into a settlement agreement pursuant to which the DOE reimbursed the Parents for tuition payments made to the Rebecca School and paid the balance of the outstanding tuition directly to the school. (Pls.' Ex. S, T at 9.) For the 2007-2008 school year, the Parents again enrolled the Student in the Rebecca School and initiated due process proceedings seeking reimbursement. (Pls.' Ex. T at 7-10.) On February 9, 2010, Judge Cote awarded the Parents reimbursement. See A.D. v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 690 F. Supp. 2d 193, 217 (S.D.N.Y. 2010). Thereafter, the parties entered into settlement agreements pursuant to which the Student attended the Rebecca School for the 2008-2009 and 2009-2010 school years at the DOE's expense. (Pls.' Ex. A; Tr. 51-52.)

### A. The CSE Meeting and IEP

On May 21, 2010, a CSE convened to develop the Student's IEP for the 2010-2011 school year. (Tr. 249; Def.'s Ex. 6 at 1.) Meeting attendees included the Parents, an interpreter

4

for the Student's mother, a parent member,[3] a district special education teacher who also served as the district representative, a district school psychologist and a social worker from the Rebecca School. (Tr. 249-50; Def.'s Ex. 6 at 2.) The Student's classroom teacher and psychologist from the Rebecca School participated via telephone. (Tr. 249-50; Def.'s Ex. 6 at 2.)

Dr. Patricia Pape, the district psychologist, brought a draft of the Student's IEP to the CSE meeting. (Tr. 306.) Pape created this draft extrapolating information from 2009 and 2010 teacher progress reports from the Rebecca School and a comprehensive psychological evaluation dated March 30, 2010. (Def.'s Exs. 3, 4, 5; Tr. 252.) At the meeting, Pape read the draft aloud to the CSE to get input as to its accuracy and the continued applicability of the information in the progress reports. (Tr. 265.) When discussing the Student's behavior, the Rebecca School representatives and other participants commented that the Student's problem behavior had de-escalated and did not "seriously interfere" with instruction. (Tr. 277-78, 305.) During the meeting, Pape edited the draft IEP as needed.

The CSE recommended that the Student be placed in a twelve month program at a public, specialized school where various related services are provided. (Def.'s Ex. 6 at 1.) A classroom with a ratio of 6:1:1—six students, one teacher, and one paraprofessional—was recommended. (Def.'s Ex. 6 at 1.) The CSE considered placement in a 12:1:1 or 8:1:1 classroom but rejected both options because the Student "experiences significant anxiety in large group settings." (Def.'s Ex. 6 at 13.) The CSE did not discuss recommending a non-public school placement. (Tr. 297.) The IEP provided that the Student receive the following additional services: (1) speech therapy for forty minutes, three times a week with an additional weekly group session; (2)

---

[3] A "parent member" is a parent of another disabled child (or a child who was recently declassified as disabled) residing in the school district or a neighboring school district who participates in the CSE to ensure the parents are comfortable with the CSE's decisions and the IEP-formulation process. 8 N.Y.C.R.R. § 200.3(a)(1)(viii); M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 233 n.8 (2d Cir. 2012).

occupational therapy for forty minutes, five times a week; and (3) individual counseling sessions for one hour twice a week. (Def.'s Ex. 6 at 14.) Each related service was increased in either frequency or duration from the prior year's IEP. (Tr. 255-56.) The IEP did not identify a specific methodology that would be used in the Student's placement classroom. (Tr. 285.)

The IEP included sixteen annual goals with corresponding short-term objectives addressing the Student's needs in academics, regulation and engagement, interaction, motor planning, emotional modulation, as well as expressive and receptive language skills. (Def.'s Ex. 6 at 6-11.) The IEP addressed the Student's academic and social/emotional management needs by providing for visual and verbal prompts, repetition and redirection, time to process information and sensory breaks. (Id. at 3-4.) The IEP also provided for the use of tools such as deep pressure breathing exercises, cool washcloths and calming verbalizations. (Id.) A transition plan for postsecondary goals listed four long term adult outcomes: (1) the Student "will integrate into the community with moderate supports;" (2) the Student "will learn job skills and participate in a vocational program;" (3) the Student "will live independently with moderate supports;" and (4) the Student "will gain vocational employment with moderate supports." (Id. at 15.)

The Parents did not object to the IEP during the CSE meeting. (Tr. 714-15.)

### B. The Placement Classroom and the Parents' Unilateral Placement

Consistent with the IEP, the DOE informed the Parents by letter dated June 15, 2010 that the Student's recommended placement for the 2010-2011 school year was in a 6:1:1 classroom at Public School 79 (the "Placement Classroom"). (Def.'s Ex. 8 at 1.) The Placement Classroom was taught by Anne Duquette and for students classified as autistic. (Tr. 111-12.) The Placement Classroom purportedly employed an "eclectic approach" that includes elements of